**Dora L. HAMPTON, Plaintiff,**

v.

**CONSO PRODUCTS, INC., Defendant.**

**Civ. A. No. 7:92–909–3K.**

United States District Court,
D. South Carolina,
Spartanburg Division.

Dec. 15, 1992.

Stephen John Henry, Greenville, S.C., for plaintiff.

Wade E. Ballard, Spartanburg, S.C., for defendant.

## ORDER

GEORGE ROSS ANDERSON, Jr.,
District Judge.

This matter is before the court for review of the magistrate's Report and Recommendation made in accordance with 28 U.S.C. § 636(b)(1)(B) and Local Rule 19.00 for the District of South Carolina.

■ The magistrate makes only a recommendation to this court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with this court. *Mathews v. Weber*, 423 U.S. 261, 270–71, 96 S.Ct. 549, 554–55, 46 L.Ed.2d 483 (1976). The court is charged with making a *de novo* determination of those portions of the Report and Recommendation to which specific objection is made, and the court may accept, reject, or modify, in whole or in part, the recommendation of the magistrate, or recommit the matter to him with instructions. 28 U.S.C. § 636(b)(1).

This case is before this court on defendant's motion for summary judgement. The plaintiff, a black female, was employed by the defendant, Conso Products, Inc., for approximately 21 years. On November 21, 1990, the defendant placed the plaintiff on a medical leave of absence and subsequently terminated her employment for failure to seek medical treatment. The plaintiff alleges that she was unlawfully discriminated against because of her race in violation of Title VII and 42 U.S.C. § 1981 when defendant placed her on medical leave. In addition, the plaintiff contends that the defendant also violated Title VII and 42 U.S.C. § 1981 by permitting a hostile working environment to exist as a result of verbal assaults by a co-worker. The plaintiff also alleges pendant state causes of action for defamation and intentional infliction of emotional distress.

The magistrate has recommended that plaintiff's actions be dismissed on defendant's motion for summary judgement. The magistrate found, as does this court, that viewing all the evidence in the light most favorable to the plaintiff there is no *genuine* issue as to any material fact and, in addition, the defendants are entitled to summary judgement as a matter of law with respect to all asserted claims.

## FINDINGS OF FACT

A review of the record before this court reveals the following facts. The plaintiff, Dora Hampton, a black female worked in the tassel department of the Defendant, Conso Products, Inc. as a machine operator. This department was predominantly composed of black female employees. The plaintiff during her employment never reported to management any allegations of racial harassment or discrimination by anyone in the plant. Furthermore, several witness (both white and black) who worked in the tassel room with the defendant deny ever hearing any racially hostile language or seeing any racially discriminatory conduct in the workplace.

Though the plaintiff's production during her employment with the defendant was satisfactory, her behavior was not. Approximately two years before the plaintiff was placed on medical leave, the plant superintendent notified the vice president of manufacturing (hereinafter Vice President) that the plaintiff was stating to other employees that individuals in the plant were telling her co-workers that a doctor had performed oral sex on her after a surgical operation. In addition, the plaintiff was also reported as stating that employees in the tassel department were putting the evil eye or spells on her. The Vice President and the plant superintendent both met with the plaintiff to investigate these allegations. The plaintiff, when approached, asserted that the allegations were true, however, she would not name any specific persons who either spread the Doctor story or cast the spells, rather the plaintiff would only refer to those she contended were involved as "people."

In October 1990, the personnel manager and the plant superintendent notified the Vice President that additional problems concerning the plaintiff had arisen. Specifically, that the plaintiff was complaining that "people" were putting "roots" [curses] on her machine and casting spells on her.

In addition, the plaintiff had stacked empty reels in front of her machine in an attempt to block herself off from the view of other employees. When meeting with management on October 30, 1990, the plaintiff again refused to give any names of employees that were supposedly casting spells on her. On November 8, 1990, the plant superintendent, personnel manager, and Vice President again met with the plaintiff to discuss the her accusations that a "root" was cast on her and her machine. The plaintiff contended that a white powder substance on the floor by her machine was evidence of such. Investigation revealed, however, that the substance was likely the result of a machine repair that required the drilling of holes in the concrete floor.

On November 13, 1990, it was again brought to the Vice President's attention that problems had arisen concerning the plaintiff. Specifically, the plaintiff had become angry regarding product orders and began throwing and kicking things. In addition, the plaintiff was telling other employees that she was going to do as a banker had done in Texas or California and come into work one morning and open fire on the other employees. These matters were discussed with the plaintiff and she was informed that if such acts did not cease she would lose her job.

After this discussion, it was brought to management's attention that the plaintiff had not only continued her statements regarding the bank employee who went to work and shot his co-workers, but that the other employees were in fear of their safety. Specifically, one employee had notified her family that if any such instance occurred to sue the defendant because they had knowledge of the plaintiff's threats. In addition, other employees requested that their machines face the door so that they could see whether the plaintiff was armed when she arrived to work, thus giving them additional time to escape. During this period, management was also made aware that the plaintiff had threatened to blow up the plant.

As a result of these instances, management contacted the plaintiff's husband and discussed the severity of the situation. The husband was informed that the plaintiff's productivity was good but that the management of the plant felt she required medical attention. Subsequent to this meeting, the Vice President, plant supervisor, and personnel manager met with the plaintiff on November 21, 1990 and informed her that she would have to take a medical leave of absence or be terminated. The plaintiff was assured that if she took the leave and obtained medical help she could return with full seniority. Furthermore, all medical bills incurred as a result would be paid by the defendant.

The plaintiff alleges that during the last year of her employment at Conso Products she was racially harassed by racial slurs from Jane Alexander, a co-worker in the tassel department. The plaintiff contends that Alexander began "slipping" using the term "nigger" around her after Jean Horne became the Section Leader of the tassel department in late 1989 or early 1990. The plaintiff's deposition reveals only two specific instances of racial slurs directed towards her by Alexander. One instance, the plaintiff contends was witnessed by another co-worker, Virginia Sprouse on November, 1990. The uncontroverted facts of record, however, establish that Sprouse was on medical leave between July, 1990, and January 30, 1991, consequently she could not have witnessed this alleged incident. Moreover, the plaintiff states in her deposition that Alexander's use of the word "nigger" "didn't really bother [her]."

The plaintiff also testified to a third incident involving a discussion of liver spots and the film "Watermelon Man." In this conversation, Alexander allegedly referred to some brown spots on her arm and stated "Dora, I've got a little nigger in me." The plaintiff responded by recommending Alexander view the movie entitled "Watermelon Man," a film about a white man who wakes up one morning and discovers he has become a black man. The plaintiff, in her deposition, admits that she considered this a "good natured conversation." In addition, the plaintiff alleges that this incident was witnessed by machine repairman, Billy

Hyatt. Hyatt, however, denies witnessing any such conversation.

## SUMMARY JUDGEMENT

■ In a motion for summary judgement the moving party has the burden to establish that viewing all the evidence in the light most favorable to the non-moving party, *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), there is "no *genuine* issue as to any *material* fact" and the moving party is "entitled to summary judgement as a matter of law." Fed.R.Civ.P. 56(c) (emphasis added). Those facts which are "material" for purposes of summary judgement are identified by the substantive law of the claim asserted. In other words, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgement. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* Conversely, an issue is not "genuine" and summary judgement warranted if there is insufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Id.* This court finds there is no genuine issue as to any material fact and the defendants are entitled to judgement as a matter of law with respect to all asserted causes of action. This determination is consistent with the Fourth Circuit's view that "Title VII claims that are plainly meritless should be disposed of early in the course of litigation through summary judgment or other pretrial motions." *Blue v. United States Dept. of the Army*, 914 F.2d 525, 535 (4th Cir.1990) *cert. denied* ── U.S. ──, 111 S.Ct. 1580, 113 L.Ed.2d 645 (1991).

## 42 U.S.C. § 1981

■ The plaintiff alleges two causes of action under 42 U.S.C. § 1981. The United States Supreme Court in *Patterson v. McLean Credit Union* clearly held that claims of racial discrimination relating to performance of contracts are not actionable under § 1981 if the conduct at issue does not interfere with either the creation or enforcement of private contracts. 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). Acts by an employer after the contract relation is established, including breach of the contract's terms or imposition of discriminatory work conditions are post formation conduct and not protected under the creation of contract provision of § 1981. *Id.* at 176–77, 109 S.Ct. at 2372–73. Neither is such conduct protected by § 1981's enforcement provision. Section 1981's enforcement provision has been held to embrace only the "protection of the legal process, and of a right to legal process, that will address and resolve contract-law claims without regard to race." *Id.* at 177, 109 S.Ct. at 2373. Moreover, the enforcement provision "prohibits discrimination that infects the legal process in ways that prevent one from enforcing contract rights, by reason of his or her race" and covers "wholly private efforts to impede access to the courts or obstruct nonjudicial methods of adjudicating disputes about the force of binding obligations." *Id.* at 177, 109 S.Ct. at 2373. Therefore plaintiff's allegations of a hostile work environment and disparate treatment resulting in constructive discharge do not violate the protections of § 1981 as decided under *Patterson.*

On November 21, 1991, subsequent to the *Patterson* decision, Congress enacted the Civil Rights Act of 1991. This Act amended § 1981 to cover incidents of racial and ethnic discrimination, including harassment, relating to the employment relationship and thus, overruled *Patterson.*[1] Be-

---

1. Section 101 of Title I of the Civil Rights Act of 1991, entitled Prohibition Against All Racial Discrimination in the Making and Enforcement of Contracts, states that "[s]ection 1977 of the Revised Statutes (42 U.S.C. 1981) is amended ... by adding ... (b) For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and ter-

mination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Civil Rights Act of 1991, Pub.L. No. 102–166, Title I, § 101, 105 Stat. 1071 (codified as amended in 42 U.S.C. § 1981).

The Act further states that its purpose is to "respond to recent decisions of the Supreme

cause the alleged conduct in this case occurred prior to the enactment of this statute the retroactivity of the Act is at issue.

Although the Fourth Circuit has not addressed whether the Civil Rights Act of 1991 has retroactive application, it has discussed retroactivity of federal statutes in other contexts. In *Leland v. Federal Ins. Administrator*, the Fourth Circuit expressly adopted the Supreme Court's holding that even where some substantial justification for retroactivity is presented, courts should be reluctant to apply a statute retroactively absent express statutory authority. 934 F.2d 524 (4th Cir.) (citing *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493) *cert. denied*, —— U.S. ——, 112 S.Ct. 417, 116 L.Ed.2d 437 (1991). The Civil Rights Act of 1991 does not grant such expressed authority, rather section 402 of the Act entitled "Effective Date" merely states, that [e]xcept as otherwise specifically provided, this Act and the amendments made by this Act shall take effect upon enactment."

Furthermore, other circuits have held that the Civil Rights Act of 1991 does not apply to conduct that occurred prior to the effective date of the Act. *See e.g., Luddington v. Indiana Bell Telephone Co.*, 966 F.2d 225 (7th Cir.1992); *Fray v. Omaha World Herald Co.*, 960 F.2d 1370 (8th Cir.1992); *Vogel v. City of Cincinnati*, 959 F.2d 594 (6th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 86, 121 L.Ed.2d 49 (1992). *But see Davis v. City and County of San Francisco*, 976 F.2d 1536 (9th Cir.1992); *Jaekel v. Equifax Marketing Decision Systems, Inc.*, 797 F.Supp. 486 (E.D.Va.1992). Additionally, in *United States v. Burke* the Supreme Court indicated that it did not believe Civil Rights Act of 1991 was retroactive due to its creation of additional remedies [2]. —— U.S. ——, —— n. 12, 112 S.Ct.

1867, 1874 n. 12, 119 L.Ed.2d 34, 47 n. 12 (1992).

In the light of the recent holdings of the Sixth, Seventh, and Eighth Circuits and the Supreme Court's statements in the *Burke* decision, this court holds that the plaintiff's § 1981 actions which are excluded under *Patterson* are not resurrected by the passing of the Civil Rights Act of 1991. Thus, the plaintiff is barred from recovery, as a matter of law, with respect to her § 1981 causes of actions.

## TITLE VII

The plaintiff alleges two Title VII causes of actions against the defendant: first, that the defendant engaged in unlawful discrimination by maintaining a racially hostile work environment, and second, that the plaintiff was unlawfully discriminated against by the defendant because of her race when she was forced to go on medical leave. The plaintiff further contends that as a result of this alleged discrimination she was forced to leave her employment.

■ Though the plaintiff's arguments attempt to apply the same analysis to both of her Title VII causes of action, the Fourth Circuit has clearly held that hostile work condition claims are to be evaluated differently than disparate treatment actions. *See* Hostile Work Environment analysis *infra*. Consequently, the two claims are analyzed separately by this court.

### A. Disparate Treatment Claims

■ Any private, non-class action, disparate treatment, discrimination claims that arise under Title VII are subject to a three step analysis for proper allocation of the burden of proof. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The first stage of the analysis requires the plaintiff to prove by a preponderance of the evidence the

Court by expanding the scope of relevant civil rights statutes." Pub.L. No. 102–166, § 3(4).

**2.** The Supreme Court in footnote 12 of the *Burke* decision referred to the Civil Rights Act of 1991 stating, "Respondents contend that Congress' recent expansion of Title VII remedial scope supports their argument that Title VII claims are inherently tort-like in nature. . . .

Unlike respondents, however, we believe that Congress' decision to permit jury trials and compensatory and punitive damages under the amended act signals a marked change in its conception of the injury redressable by Title VII, and cannot be imported back into analysis of the statute as it existed at the time of this lawsuit."

existence of facts sufficient to establish a *prima facie* case of racial discrimination. *Id.* at 802, 93 S.Ct. at 1824; *Moore v. City of Charlotte*, 754 F.2d 1100, 1105 (4th Cir. 1985). The type of factual showing that will carry the plaintiff's burden to establish a *prima facie* case of unlawful discrimination will vary with the circumstances of each individual claim. *McDonnell Douglas*, 411 U.S. at 802, n. 13, 93 S.Ct. at 1824, n. 13. In the second stage, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* at 802, 93 S.Ct. at 1824. The defendant's burden at this stage is not to *prove* such a reason by the preponderance of the evidence, but merely to explain its legitimate reasons. *Monroe v. Burlington Industries, Inc.*, 784 F.2d 568, 571 (4th Cir.1986). In the final stage, the plaintiff must prove by a preponderance of the evidence that the reason articulated by the defendant was a pretext for unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824.

■ The plaintiff in this case claims that her *prima facie* case is met because she "is black, was an excellent performer by all accounts for the Defendant, was fired and replaced." The plaintiff, however, erroneously equates productivity with overall job performance. Though the plaintiff's production was always satisfactory, her behavior on the job was not. The plaintiff had repeatedly engaged in conduct that was both disruptive to the production and morale of her co-workers. Management contends that it was this conduct that prompted their placement of the plaintiff on medical leave. Consequently, this case is more accurately analyzed using a "disciplinary decision" framework. "The purpose of the prima facie requirement is therefore served and the requirement met upon a showing (1) that plaintiff engaged in prohibited conduct similar to that of a person of another race, color, sex, religion, or national origin, and (2) that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person." *Moore v. City of Charlotte, N.C.*, 754 F.2d 1100, 1105–06 (4th Cir.), *cert. denied*, 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985). The plaintiff has failed to meet this burden. She has offered no evidence of disparate discipline.

Even assuming that the plaintiff's *prima facie* case is satisfied because she "is black, was an excellent performer by all accounts for the Defendant, was fired and replaced", the defendant has sufficiently articulated a legitimate, nondiscriminatory reason for its actions. The defense has shown that the plaintiff was asked to take medical leave because her conduct was disruptive to the performance and morale of the defendant's other employees. In addition, the defense has shown that the defendant could have reasonably feared that the continued employment of the plaintiff posed a threat to the safety of other employees and management alike. Finally, the plaintiff has failed to establish sufficient evidence to establish that she could possibly prove by a preponderance of the evidence that these reasons articulated by the defendant were a pretext for unlawful discrimination. This court finds that viewing all the evidence in a light most favorable to the plaintiff, no reasonable finder of fact could determine that the defendant's reasons for requesting the plaintiff to take a medical leave were a pretext for unlawful discrimination. Accordingly, there is no *genuine* issue of material fact and the defendant is entitled to summary judgement as a matter of law on the Title VII disparate treatment cause of action.

**B. Hostile Working Environment**

■ Though a claim of unlawful discrimination based upon racial harassment resulting in a hostile work environment might be analyzed under the aforementioned disparate treatment formula, the Fourth Circuit has held that work condition claims should be analyzed differently. *Katz v. Dole*, 709 F.2d 251, 255 (4th Cir. 1983) (court addressing sexual harassment issue). This distinction is attributed to the fact that harassment claims almost always represent an intentional assault on the individual's innermost privacy. Consequently, once the plaintiff proves the alleged conduct occurred, the inquiry in hostile work

environment actions focuses on the responsibility of the employer for the harassment. *Id.* at 255. In contrast, motive is the focus of inquiry in disparate treatment claims, once the plaintiff has established he or she was disadvantaged. *Id.* Thus, in harassment claims, "[e]xcept in situations where a proprietor, partner, or corporate officer participates personally in the harassing behavior, the plaintiff [has] the additional responsibility of demonstrating the propriety of holding the employer liable under some theory of *respondeat superior*." *Id.* This is accomplished by placing the burden on the plaintiff to establish that the employer had actual or constructive knowledge of the existence of a hostile working environment and took no adequate remedial action. The Fourth Circuit has incorporated this approach of evaluating employer liability for hostile work conditions in the following two step analysis:

> First, the plaintiff must make a prima facie showing that … harassing actions took place, and if this is done, the employer may rebut the showing either directly, by proving that the events did not take place, or indirectly, by showing that they were isolated or genuinely trivial. Second, the plaintiff must show that the employer knew or should have known of the harassment, and took no effectual action to correct the situation.

*Id.* at 256.

Moreover, the Supreme Court has acknowledged that "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII.[3] *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). In doing so, the Court cited *Rogers v. EEOC*, 454 F.2d 234 (5th 1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972) which held that a mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee would not affect the conditions of employment to sufficiently signifi-

cant degree to violate Title VII. The Supreme Court in *Vinson* held that the alleged sexually harassing conduct must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment. 477 U.S. at 67, 106 S.Ct. at 2405 (1986).

■ Though *Katz* and *Vinson* both dealt with sexual harassment, the Fourth Circuit has specifically adopted both the *Katz* two tiered analysis and the *Vinson* severe/pervasive standard in a racially hostile work environment context. *White v. Federal Express Corp.*, 939 F.2d 157 (4th Cir.1991). The Fourth Circuit in *White* specifically stated:

> We have held in the context of gender discrimination actions that, in order to maintain an action under Title VII based on hostile working conditions, "the plaintiff must demonstrate that the employer had actual or constructive knowledge of the existence of a [racially] hostile working environment…." Once the plaintiff has made a prima facie showing of a hostile working environment, "the employer may rebut the showing either directly, by proving that the events did not take place, or indirectly, by showing that they were isolated or genuinely trivial." Furthermore, for the hostile working environment to be actionable under Title VII, the Supreme Court has held, again in the context of gender discrimination, that "it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'"

*Id.* at 160. Furthermore, the Fourth Circuit in *White*, stated that the *Vinson* severe/pervasive element contained both a "subjective as well as objective component." *Id.* at 161. Thus, the finder of fact must evaluate the evidence from both an objective perspective and from the point of view of the alleged victim.

■ In light of the conglomeration of standards articulated in *White*, this court

---

**3.** Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer to discriminate against any individual with respect to his compensation, terms, condi-

tions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

takes this opportunity to adopt a consistent yet more logical framework of analysis. In a Title VII action alleging harassment in the form of a hostile work environment the plaintiff must make a *prima facie* showing of the following:

1) the employee was subject to unwelcome harassment in a work related setting;

2) the harassment complained of was based on race, sex, religion, or national origin;

3) the harassment, viewed from both a subjective and objective perspective, was so severe or pervasive that it affected a term, condition, or privilege of employment; and

4) the employer either knew or should have known of the harassment and took no effective remedial action.

If the plaintiff establishes this showing by a preponderance of the evidence, the employer may rebut such either directly, by proving that the events did not take place, or indirectly, by showing that the actions were isolated, genuinely trivial, or did not alter the conditions of the victim's employment by creating an abusive work environment. The employer may also rebut the plaintiff's *prima facie* case by establishing that it took remedial measures reasonably calculated to end the harassment, though not effective.

This type of analytical framework is not unique. Similar approaches, with minor variations, have been adopted in other Circuits. *See e.g., Chamberlin v. 101 Realty, Inc.*, 915 F.2d 777 (1st Cir.1990); *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554 (11th Cir.1987). The Fourth Circuit, prior to *White*, used a similar approach in a sexual harassment context. *Swentek v. USAIR, Inc.*, 830 F.2d 552 (4th Cir.1987); *Paroline v. Unisys Corp.*, 879 F.2d 100 (4th Cir.1989). The Fourth Circuit in *Swentek* stated that "the plaintiff must show that the conduct in question was unwelcome, that the harassment was based on sex, and that the harassment was sufficiently severe or pervasive to create an abusive working environment. The plaintiff must also show some basis for impos-

ing liability on the employer." *Swentek* at 557.

■■■ In the instant case, viewing all the evidence in a light most favorable to the plaintiff, she has failed to establish a *prima facie* showing that either *pervasive* or *severe* racially harassing actions transpired in her work environment. Plaintiff's own testimony established that the alleged racial slurs had no impact on her emotionally. Consequently, the subjective element of the "severe/pervasiveness" criteria has not been met. In addition, the plaintiff alleges only five incidents of racial slurs over a twenty-one year period of employment. It should be noted however, that plaintiff contends that these five incidents occurred in the last two years of employment. Of these five incidents, only two involved racial slurs that were directed towards the plaintiff and a third was used in a good natured conversation. Occasional or sporadic uses of racial slurs or epithets will not support an actionable claim of racial harassment under Title VII. *Vinson*, 477 U.S. at 67, 106 S.Ct. at 2405. Consequently, this court finds that no reasonable trier of fact could determine that the five alleged incidents involving racial slurs satisfy the objective element of the "severe/pervasive" criteria. As a result of the foregoing analysis, this court holds there is no *genuine* issue of material fact and the defendant is entitled to summary judgement as a matter of law on the Title VII hostile work environment cause of action.

## DEFAMATION

The plaintiff also alleges a claim for defamation of character based on state law. The plaintiff's complaint alleges that the defendant, through statements and conduct, gave the impression to others that the plaintiff was mentally ill and/or in need of medical confinement. The complaint further alleges that the defendant published to others, including persons inside and outside the company, that the plaintiff was in need of mental health treatment and was mentally ill.

■■■ For the plaintiff to prevail in an action for defamation of character under

South Carolina law, it is necessary that she allege and prove:

1) that a statement was made which, either on its face or by reason of extrinsic facts, tends to impeach the reputation of the plaintiff;

2) that the statement was published to a third person, other than the plaintiff; and

3) that as a result of the statement the plaintiff suffered either special or general damages:

*Capps v. Watts*, 271 S.C. 276, 246 S.E.2d 606 (1978). Special damages require a showing that the plaintiff suffered either a pecuniary or material loss, whereas, general damages need not be proved, they are damages that are legally presumed. *Id.* "In determining whether a publication is actionable by reason of a presumption of general damages, the court looks to the inference of hurt which arises from publication as established by the general consent of man." *Id.* 246 S.E.2d at 611.

 The plaintiff in this action has failed to provide any evidence that any injurious statements were published by the defendant or its agents to a third person, other than the plaintiff. The plaintiff cites *Tyler v. Macks Stores of South Carolina*, 275 S.C. 456, 272 S.E.2d 633 (1980), in support of her contention that the defendant's act of placing the plaintiff on medical leave satisfies the publication requirement. In *Tyler* the South Carolina Supreme Court affirmed a denial of demurrer in an action for defamation where a employee who was in a position of trust was discharged after being forced to take a polygraph test over his protest. *Id.* 272 S.E.2d at 633. In doing so, the court stated, " '[to] render the defamatory statement actionable, it is not necessary that the false charge be made in a direct, open and positive manner. A mere insinuation is as actionable as a positive assertion if it is *false* and *malicious* and the meaning is plain. *Id.* at 634 (quoting *Timmons v. News and Press, Inc.*, 232 S.C. 639, 103 S.E.2d 277, 280 (1958)) (emphasis added).

In the instant case, the plaintiff has failed to offer any evidence that she does not require medical treatment or is not mentally ill. Furthermore, viewing all the evidence in a light most favorable to the plaintiff a reasonable trier of fact could not find that the defendant acted maliciously in requesting the plaintiff to go on medical leave and receive medical treatment at the defendant's expense. Accordingly, this court holds that there is no *genuine* issue of material fact and that the defendant is entitled to summary judgement as a matter of law in the defamation action.

## OUTRAGE

 The intentional infliction of emotional distress, otherwise referred to as outrage, was expressly recognized by the South Carolina Supreme Court as an actionable tort in 1981. *Ford v. Hutson*, 276 S.C. 157, 276 S.E.2d 776 (1981). In recognizing this cause of action, the Court articulated the following elements of the tort:

1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct;

2) the conduct was so "extreme and outrageous" as to exceed "all possible bounds of decency" and must be regarded as "atrocious and utterly intolerable in a civilized community;"

3) the actions of the defendant caused the plaintiff's emotional distress; and

4) the emotional distress suffered by the plaintiff was "severe" so that "no reasonable man could be expected to endure it."

*Id.* 276 S.E.2d at 778 (quoting with approval language from *Vicnire v. Ford Motor Co.*, 401 A.2d 148 (Me.1979) (citations omitted). It is the court's responsibility to determine whether the defendant's conduct may be reasonably regarded as so extreme and outrageous as to permit recovery, and only where reasonable persons may differ is the question one for the jury. *Todd v. South Carolina Farm Bureau Mutual Ins.*, 283 S.C. 155, 321 S.E.2d 602, 609 (Ct.App.1984), *modified* 287 S.C. 190, 336 S.E.2d 472 (1985).

The plaintiff alleges that the defendant intentionally and/or willfully caused emotional harm to her by condoning or failing to end a pattern of racial harassment against the plaintiff by a co-worker, Jane Alexander. The plaintiff further alleges that the harassment was in the form of racial slurs and that racial slurs are a type of conduct intolerable in this society.

 Viewing all the evidence in a light most favorable to the plaintiff, she has failed to establish evidence sufficient to convince a reasonable trier of fact that the defendant's conduct was "outrageous." The plaintiff's deposition reveals only two specific instances of racial slurs directed towards her by Alexander. Assuming both of these alleged incidents occurred in the presence of Jean Horne and Horne instituted no disciplinary actions, this court finds that no reasonable juror could determine that such inaction constituted behavior so outrageous in character, so extreme in degree, so atrocious and utterly intolerable as to make the defendant liable for the tort of outrage. *See Corder v. Champion Road Machinery Int'l Corp.*, 283 S.C. 520, 324 S.E.2d 79 (Ct.App.1984), *cert. denied,* 286 S.C. 126, 332 S.E.2d 533 (1985) (a firing in retaliation for filing a workers' compensation claim found not to meet the level of outrageous conduct necessary to sustain an action for outrage) [4].

Furthermore, viewing all the evidence in a light most favorable to the plaintiff, the plaintiff has failed to establish evidence sufficient to convince a reasonable trier of fact that she suffered emotional distress that was so "severe" that "no reasonable [person] could be expected to endure it." The plaintiff's own testimony established that the alleged racial slurs had no impact on her emotionally. In addition, the plaintiff's testimony also reveals that she has not sought treatment from a doctor for any problems related to her alleged emotional distress. As a result of the foregoing analysis, this court holds there is no *genuine* issue of material fact and the defendant is

entitled to summary judgement as a matter of law in the plaintiff's action for intentional infliction of emotional distress.

Accordingly, summary judgement is rendered in favor of the defendant with respect to each of the plaintiff's causes of action.

---

**4.** Such action would now be actionable under statute. S.C.Code Ann. § 41–1–80 (Law Co-op Supp.1991).